```
            IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF ALABAMA
                      SOUTHERN DIVISION
```

SANDRA J. BRISTER,              }
                                }
    Plaintiff                   }
                                }    CIVIL ACTION NO.
    vs.                         }
                                }    CV-97-AR-451-S
LAKESHORE FOUNDATION, INC.,     }
                                }
    Defendant                   }

                      MEMORANDUM OPINION

     Presently before the court is a motion for summary judgment filed by defendant, Lakeshore Foundation, Inc. ("Lakeshore"), in this race discrimination action brought by plaintiff, Sandra J. Brister ("Brister"). Also before the court is Lakeshore's motion to strike Brister's rebuttal brief and a motion to strike Brister's exhibit number six, submitted in opposition to Lakeshore's motion for summary judgment. In the alternative to the motion to strike Brister's exhibit, Lakeshore requests leave to file a declaration. Brister alleges that Lakeshore discharged her from her position, as a nursing assistant, based upon her race in violation of Title VII, 42 U.S.C. § 2000e et seq.

     Because Brister has not cited any legal authority to support submission of her rebuttal brief as non-movant, Lakeshore's motion to strike the brief will be granted. In addition, the court finds that there are no genuinely disputed questions of material fact and therefore Lakeshore's motion for summary

judgment will also be granted. Consequently, Lakeshore's motion to strike Brister's exhibit number six becomes moot.

## I. FACTS[1]

Brister, who is black, began working at Lakeshore in January 1988. She was a full-time nursing assistant whom Lakeshore disciplined for tardiness on several occasions. Lakeshore first disciplined Brister in 1988 by placing a letter in her employment file. (Pl.'s Ex. 8.) Lakeshore next disciplined Brister in 1990, first verbally and then in writing, after she accumulated a total of twenty tardy occurrences. (Pl.'s Ex. 8.) Although Lakeshore annually removes evidence of attendance and tardiness actions for purposes of accumulating further attendance demerits, Lakeshore may consider the employee's "overall record of performance" when considering discipline. (Pl.'s Ex. 2 at pg. 1.)

In spite of these disciplinary measures, Brister received acceptable performance revues throughout her tenure. During her first four years at Lakeshore, she received a "meets standards" rating. (Pl.'s Ex. 7.) However, in 1992 and 1994 her performance improved and she received an overall rating of

---

[1] The court has an obligation to view the facts in the light most favorable to the plaintiff. *Swint v. City of Wadley*, 51 F.3d 988, 995 (11th Cir. 1995).

2

"exceeds standards."   (Pl.'s Ex. 7.)

On Easter Sunday in 1994, Brister was scheduled to work from 7:00 a.m. until 3:00 p.m on the west wing of the hospital's second floor ("2 west").  Because Brister wanted to leave at noon, in order to attend her child's Easter performance at church,  Brister approached Karen Smith ("Smith"), the house supervisor, and inquired about leaving early.  Smith responded that she would see what could be done.  However, one of the three nursing assistants originally scheduled to work on Easter had not shown up for work.  Therefore, contends Lakeshore, 2 west was short staffed.  In addition, Lakeshore argues that the severity of the patients' illnesses, or "acuity" level, on 2 west necessitated two additional nursing assistants above the three originally scheduled to work on Easter Sunday.  However, Brister has introduced evidence that the acuity level for the day in question was normal or below normal. (Pl.'s Ex. 4, Giles Dec. ¶5).

Smith eventually located an additional nursing assistant to work on Easter Sunday.  Patricia Lawson ("Lawson") received a call from someone at the hospital who requested that she come to work early in exchange for a bonus payment.  Although Lawson does not remember the identity of the caller, she does remember the

3

caller indicating that someone was leaving work early. (Pl.'s Ex. 20, Lawson Dep. at 28.) Smith then called Brister and said it had been difficult to obtain help, but someone was coming in at noon. (Brister Dep. at 69 - 70.) Brister admits, however, that Smith never <u>explicitly</u> gave Brister permission to leave at noon. (Brister Dep. at 70 - 71.) Instead, Brister assumed that Lawson was coming in to replace Brister. Lawson also assumed that Lawson was replacing Brister. (Pl.'s Ex. 20, Lawson Dep. at 29.) When Lawson arrived, Brister reviewed the status of her patients with Lawson then left the hospital. (Pl.'s Ex. 20, Lawson Dep. at 30.) When Brister returned to work the following Tuesday, Lakeshore terminated her for leaving work without permission.

## II.   SUMMARY JUDGMENT STANDARD

Under F.R.Civ.P. 56(c), summary judgment is appropriate where "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law."

## III. BRISTER HAS NOT ESTABLISHED A PRIMA FACIE CASE OF DISCRIMINATION

Brister can establish a prima facie case of discrimination if she can show: 1) that she is a member of a protected class, 2) that she was subjected to an adverse job action, 3) that she was

4

qualified for her position, and 4) that Lakeshore treated similarly situated employees more favorably. *See Jones v. Bessemer Carraway Medical Ctr.*, 137 F.3d 1306, 1310 (11th Cir. 1998). Brister attempts to meet the fourth element of her prima facie case by pointing to circumstances involving employees Mandy Putnam ("Putnam") and Christy Collier ("Collier"), who are white. It is undisputed that Lakeshore failed to immediately terminate Putnam and Collier when they failed to work their scheduled shifts. Such evidence is enough to establish a prima facie case of disparate treatment, argues Brister.

In response, Lakeshore first argues that Putnam is not an appropriate comparator. *See Bessemer Carraway*, 137 F.3d at 1311 ("If Plaintiff fails to identify similarly situated, nonminority employees who were treated more favorably, her case must fail because the burden is on her to establish her prima facie case.") (citations omitted). Next, Lakeshore contends that it disciplined Collier in the same manner as Brister, so that Brister cannot make out a prima facie case for discrimination.

### A. Mandy Putnam

Putnam, who is also a nursing assistant, received a disciplinary letter after she left the hospital in the middle of her shift without permission from a supervisor. Although

Lakeshore could have terminated Putnam for such conduct, her unit supervisor, Cheryl Rozelle ("Rozelle") investigated the incident and determined that termination was not justified. According to Rozelle, Putnam's immediate supervisor had inappropriately changed Putnam's unit assignment three times and had treated Putnam in a disrespectful manner after Putnam complained. Another mitigating factor, claimed Rozelle, was that Putnam was not scheduled to work on the day in question, but had come in to provide additional staff support. These factors taken together provided mitigating circumstances, according Rozelle. Therefore, argues Lakeshore, Putnam is not an appropriate comparator. *See Nix v. WLCY Radio/Rahall Communications*, 783 F.2d 1181, 1186 (11th Cir. 1984)("[I]f an employer applies a rule differently to people it believes are differently situated, no discriminatory intent has been show.") (citation omitted and alterations in original).

Brister counters by arguing that the most important consideration when determining whether two employees are similarly situated is "the nature of the offenses committed and the nature of the punishments imposed." *Bessemer Carraway*, 137 F.3d at 1311 (citing *Jones v. Gerwens*, 874 F.2d 1534, 1539 - 40 (11th Cir. 1989)). Because Putnam and Brister committed precisely the same offense, leaving their shifts without

authorization, Putnam is an appropriate comparator contends Brister.

Brister's argument is unpersuasive. Although Brister presents evidence that she and Putnam committed the same offense, Putnam is not an appropriate comparator in one important respect; there is no evidence that Putnam had ever received any disciplinary action prior to the incident in question. Therefore, Putnam and Brister are not "similarly situated."

Further, contrary to Brister's assertions, Lakeshore did have the right to consider Brister's past disciplinary infractions when determining what discipline to impose in her case. Lakeshore's disciplinary policy specifically states that "disciplinary situations will be evaluated in light of their individual circumstances, including the <u>employee's overall record of performance</u>." (Pl.'s Ex. 2 at pg. 1.) Moreover, the policy gives Lakeshore the discretion to terminate an employee, "without prior warning" for "leaving Lakeshore during working hours without authorization." (Pl.'s Ex. 2 at ¶3.) Even though disciplinary actions concerning attendance and tardiness are removed annually from an employee's file for purposes of determining attendance demerits, (Pl.'s Ex. 6 at pg 1.), "[a]ny verbal or written warning issued for an attendance problem ...

7

will be considered when evaluating disciplinary situations. Specifically, a written warning for an attendance problem will be considered when evaluating the need for discharge." (Pl.'s Ex. 2 at pg 2.) Therefore, Lakeshore had the right to consider Brister's prior misconduct. Because Putnam had not accumulated any prior disciplinary actions, she was not an appropriate comparator.

**B. Christy Collier**

Collier is another white nursing assistant whom Brister puts forth as a comparator. Collier committed an offense that was of the same "nature" as Brister's. *See Bessemer Carraway,* 137 F.3d at 1311. Both Brister and Collier were off duty without express authorization from Lakeshore. (Pl.'s Ex. 1 to Boggs Dep.) In Collier's case, she failed to report to work on three separate occasions: March 30, 1992, May 5, 1992 and August 2, 1992. Unlike Brister, however, Lakeshore did not terminate Collier until the third time she failed to cover her shift. After the first absence Lakeshore gave Collier a verbal warning. The second time Lakeshore gave her a written warning and finally it terminated Collier after her third unauthorized absence. Brister argues that, by failing to give her a warning prior to her discharge, Lakeshore disciplined her more severely than it did Collier who was also absent from work without authorization.

8

Lakeshore responds by arguing that any comparison between Brister and Collier only serves to support Lakeshore's assertion that it treated Brister and Collier equally. Lakeshore points out that both Collier and Brister had received a verbal warning and a written warning prior to termination. Because there was no disparate treatment, Brister has not established a prima facie case of discrimination, contends Lakeshore.

The court finds Lakeshore's contention persuasive. First, Brister received a verbal warning and a written warning for tardiness pursuant to Lakeshore's attendance policy. (Pl.'s Ex. 6.) When Brister left her shift without express authorization, her misconduct no longer came within the parameters of the attendance policy. Instead, she committed a Group A offense which is covered under Lakeshore's general disciplinary policy (Pl.'s Ex. 2.) Under this policy, "[discharge normally is appropriate for any violation of Group A offenses .... [such as] leaving Lakeshore during working hours without authorization." (Pl.'s Ex. 2 at pg. 2, 5 ¶3.) In addition, the policy explicitly allows Lakeshore to consider past instances of attendance related discipline when determining the appropriate disciplinary measure for violating a non-attendance related policy. (Pl.'s Ex. 2 at pg 2.) Finally, the general disciplinary policy explicitly

provides that employees who commit Group A offenses, "may be discharged without prior warning." (Pl.'s Ex. 2 at pg. 3.)

Collier's disciplinary history is very similar to Brister's. Lakeshore first warned Collier verbally and then in writing under Lakeshore's attendance policy for her "unscheduled absence from work ...." (Pl.'s Ex. 6) Collier's supervisor then instructed Collier to work on August 2, 1992, or to have someone cover her shift. (Pl.'s Ex. 10.) When Collier failed to comply with the supervisor's instructions, her misconduct fell within the general disciplinary policy, as did Brister's final act of misconduct. Collier's "[i]nsubordination ... or refusal to follow the instructions of [her] supervisor[]" constituted a dischargeable Group A offense. In addition, Collier was subject to discharge because she repeated "the same offense for which a written warning was given within a 12 month period ...." (Pl.'s Ex. 2 at pg 2.)

Therefore, the undisputed evidence shows that Lakeshore properly discharged both Brister and Collier in accordance with its disciplinary policies. Both received two warnings, pursuant to Lakeshore's attendance policy, prior to the final incident of misconduct. After they received the two warnings, Lakeshore terminated both Brister and Collier for committing Group A

offenses. Although Lakeshore responded to Collier's two earlier absences with a warning, such a response was inappropriate in Brister's case. When Brister left her shift without authorization, she did not commit an <u>attendance</u> policy violation, as did Collier when she failed to show up for work. The attendance and general disciplinary policies read together show that Lakeshore considers leaving one's shift a far more serious incidence of misconduct than failing to show up for work. Given that the policies allow for the immediate discharge of an employee the first time she leaves work without authorization, but permits Lakeshore to issue a warning the first time she fails to show up for work, Lakeshore was under no oblation to warn Brister. Thus Brister is unable to show that Collier was treated more favorably. Accordingly, Brister has failed to establish a prima facie case of discrimination.

While it may be unfortunate that Lakeshore chose to terminate Brister based on an apparent misunderstanding, there is no evidence that its decision violated Title VII. The court feels compelled to mention that a wise employer would have been hesitant to terminate an employee under such circumstances, particularly when she had not been disciplined for four years and had been evaluated as an above average employee. However, this court is unable to substitute its judgment for that of the

defendant employer.

## IV. RES JUDICATA

Finally, Brister contends that the court should not grant summary judgment for the defendant because a prior "judicial" determination involving the same parties and the same cause of action prevents this court from granting summary judgment. Brister argues that a state administrative referee's grant of unemployment benefits has a res judicata effect in the present case.

While a state <u>judicial</u> decision would preclude this court from considering certain issues in this case, Brister has not supported her res judicata claim by citing to any Alabama state "<u>judicial</u>" decision. *See Tuma v. Dade County Public Schools*, 989 F. Supp. 1471, 1473 - 74 (S.D. Fla. 1998) ("[A] state court ruling on a claim of employment discrimination may bar a federal court from revisiting the issue under the guise of a Title VII claim. Similarly, rules of preclusion apply when a state administrative agency's rejection of a discrimination claim is affirmed by a state appellate court."). Brister attempts to support her res judicata claim by citing to a referee's decision from the State of Alabama Department of Industrial Unemployment Compensation Agency. (Pl.'s Ex. 3.) Brister has cited to no

12

legal authority which holds that a state administrative "agency" decision is equivalent to a "judicial" decision. While a party may appeal the unemployment compensation agency's decision to the state circuit court, Ala. Code § 25-4-95, Lakeshore's refusal to pursue further appeals does not transform the referee's administrative ruling into a judicial decision. *See Tuma*, 989 F. Supp. at 1473 ("Although the party claiming discrimination need not seek an appeal of the administrative decision, <u>if she chooses</u> to do so she is bound by the state court's judgment."). Therefore, Brister's res judicata claim must fail.

Even if Brister could magically transform an administrative agency decision into a judicial decision she would still be unable to avoid a summary judgment decision in favor of the defendants. The referee's decision does not resolve the employment discrimination claim presently before this court. Instead, the referee simply found that Brister's termination did not result from "misconduct," as defined in the Alabama code. The issue before this court is not whether Brister engaged in misconduct, as defined under the Alabama code, but whether there is evidence from which a jury might find unlawful discrimination. Because this court has a duty to consider the facts in the light most favorable to Brister, the court has considered Brister's deposition as entirely truthful. Consequently, the court

analyzed the present motion for summary judgment by assuming that Brister did not have explicit authorization to leave the hospital, but that she assumed she had permission to leave. Therefore, a binding determination that Brister failed to engage in any "misconduct" would do nothing to alter the court's Title VII analysis.

## VI. CONCLUSION

Because there is no genuine dispute as to any material issue of fact, defendant is entitled to summary judgment. A separate appropriate order will be entered.

DONE this 4th day of June, 1998.

WILLIAM M. ACKER, JR.
UNITED STATES DISTRICT JUDGE